## SCHOOK *v.* ZIMMERMAN.

1. EQUITY—JURISDICTION—ADEQUATE REMEDY AT LAW.

Although the court of equity retains jurisdiction of controversies for which the court of law may afford adequate relief, when involved with or growing out of an equitable cause, that confers jurisdiction upon the court in chancery, the bare pleading in conjunction with such issues of equitable rights not sufficiently proved does not give equity the right to try a controversy of otherwise exclusive law jurisdiction: the legal remedy administered in chancery must be connected with and grow out of an equitable right.

2. SAME—FIDUCIARY RELATIONS—REMEDIES.

Complainant, a liquor dealer, claimed that defendants visited his saloon during a storm and inquired about mining properties in the neighborhood, saying that they were looking for a mine and informing complainant that they had no expectation of securing it for nothing, and that if he could find them a workable mine, they would "whack" with him. He directed them to certain mineral lands which proved to contain valuable deposits, and defendants secured the property and developed it under a royalty contract. *Held*, in a suit for specific performance of the alleged agreement, that complainant's remedy, if any, was at law, that no such definite contract as the court of equity must find was proven and that no fiduciary relation existed such as would give complainant a right to an accounting, or to follow the profits as a trust.

3. SAME—IMPLIED CONTRACT—CUSTOM—NOTICE.

Proof of a custom to pay a definite percentage of the profits could not bind defendants, who were not shown to have notice or knowledge of a usage of the kind averred.

4. SAME—DEFINITE CONTRACT.

Though an action at law may be maintained for breach of contract, some of the terms of which have not been established with exactitude, it is otherwise in proceedings for specific enforcement, which require a greater degree of certainty than do actions for damages.

5. SAME.

The term "whack" claimed to have been used in the negotiations between the parties could not support specific enforcement, which can only be decreed if the intent of the parties is manifest; and, as the phrase ordinarily means to divide into shares, apportion, square accounts, or pay, the proportion to which either was entitled was conjectural.

Appeal from Iron; Flannigan, J. Submitted June 9, 1915. (Docket No. 21.) Decided December 21, 1915.

Bill by Paul Schook against Eugene Zimmerman and others for specific performance. From a decree

for complainant granting part relief both parties appeal. Reversed.

*F. H. Abbott* (*M. J. Sherwood,* of counsel), for complainant.

*M. S. McDonough* and *Charles H. Watson* (*Claudius B. Grant,* of counsel), for defendants.

STEERE, J. The nature and purpose of complainant's somewhat lengthy bill, stated in brief outline, is to obtain specific performance of an oral contract, alleged to have been made with him by defendants Clutts and Zimmerman, under which, through his efforts, they secured an option for a 30-year iron-mining lease upon certain described land in Iron county, Mich.; that after certain explorations, by which it was ascertained the location contained extensive deposits of valuable iron ore, Zimmerman and Clutts transferred the mining lease which they had obtained under said option to the defendant Spring Valley Iron Company, a corporation which they caused to be organized to take over and operate said property, and which, through its officers and stockholders, had full knowledge of complainant's agreement with Zimmerman and Clutts and rights thereunder; that by such contract, which complainant has fully performed on his part, Zimmerman and Clutts agreed and promised they would give and set over to him "a just, fair, and proper share of such profits as should thereafter accrue to the said defendants Zimmerman and Clutts, or their assigns, from mining, removing, and disposing of the iron ore which would be taken from said lands under such mining lease," which they have neglected and refused to do; that it is customary to pay and receive for like service in the iron districts of Michigan and in Iron county 10 cents on each ton of ore mined and shipped under such a lease as they obtained through his efforts, and by their said agreement with

him complainant is justly entitled to such an amount as his share of the profits of such joint venture. Complainant therefore prays the court to decree specific performance of said contract and—

"determine the amount which this complainant is equitably entitled to receive upon each ton of iron ore heretofore mined and shipped, and upon each ton of iron ore which shall hereafter be mined and shipped from said lands by the said Spring Valley Iron Company, its successors or assigns, under said mining lease held by said company as aforesaid."

But, if the court finds that the defendant mining company is not liable upon such contract, that it determine and award to him a relative part of the capital stock of said company belonging to Zimmerman and Clutts, injunction being asked to restrain them from incumbering or disposing of their stock in the meantime. Defendants by their answer traverse and deny all material allegations of complainant's bill.

Complainant had been a resident of Iron county for over 20 years, working at first as a barkeeper at Iron River, but most of the time engaged in the saloon business for himself at Crystal Falls, where he was running a saloon and livery stable when he first met defendants Zimmerman and Clutts, in November, 1906. From the miners and explorers who frequented his saloon he acquired a general knowledge of what was being done in their line, and was fairly conversant with the mineral discoveries and developments in that vicinity. Prior to the day when he claims the contract sued upon was entered into, between the 15th and 20th of November, 1906, he had never heard of Clutts and Zimmerman, nor they of him, so far as shown. As he relates this first meeting, they presented themselves at the bar of his saloon between 4 and 5 o'clock in the afternoon of that day and asked for "a drink of O. F. C. Taylor bottled in bond," which he served

them, with the suggestion that it was a rather stormy day, in which view they concurred. Shortly following this, the contract for which specific performance is sought was entered into as follows:

"And they stood there a while and called for something, and they commenced to ask me—they asked me what kind of a town this was, and what kind of a country this was. I says: 'This was a lumber town, but now it is a mining town. Principally mining.' I says, 'It is one of the best mining towns in the upper peninsula.' So they started looking at one another and looked at me. They asked me if there was any properties here to be had. I says, 'I know of three properties to be had.' We talked a little while, and I says, 'I know of three properties to be had, and they are good ones.' 'Well, can you get us a property?' I says that I could. Then they stopped, and Mr. Zimmerman says to me, 'We will stop here and introduce ourselves. This gentleman doesn't know us, and we don't know him. My name is Eugene Zimmerman, from Detroit, and this is Mr. J. C. Clutts, from Wellston, Ohio. This gentleman has furnaces, and I own railroads, and we are up here to get a mine. Can you get a mine for us? Can you get us a property?' I said that I could. So he says: 'If you can get us a property, we don't want it for nothing. If you get us the property and it proves to be a mine, we will whack with you.' Mr. Zimmerman and Mr. Clutts said that. But I am a little ahead of my story. There were some people came in that I did not want to talk in front of, and I gave Mr. Zimmerman a wink and also Mr. Clutts, and they kept still, and I waited on them and they went out."

He further testified that they repeated this offer and promise to "whack" 5 or 10 times, and before they left the saloon said, in response to his suggestion, that when they got home they would send up an iron-mining man to see him; that they left that night, and complainant did not see them again until April, 1907. This is the only agreement of which he testifies, and constitutes the contract upon which this suit is found-

ed. His evidence as to subsequent events relates to their ratification and his performance of it. He says:

"I never had anything from these people than the agreement."

Defendant Clutts, a resident of Wellston, Ohio, was extensively interested in blast furnaces and coal mining, while defendant Zimmerman, of Cincinnati, Ohio, was president of the Ann Arbor and Detroit, Toledo & Ironton Railroads, prominently connected with and interested in railroad and steamboat transportation, as well as various mining, manufacturing, and other enterprises. His road was carrying coal from Ohio to Frankfort on Lake Michigan, shipping it across the lake, and he conceived the idea of securing iron ore for return freight to furnaces located upon the road in Ohio. In furtherance of that project he several times visited and interviewed officials of the Carpenter-Cook Company, of Menominee, a patron of his railroad, which owned large tracts of land in Iron county, and on the occasion in question had just come from Menominee, following such an interview, accompanied by Clutts, who manufactured iron at Wellston on Zimmerman's line. Being impressed by representations of officials of the Carpenter-Cook Company and offered an option upon some of its land near Crystal Falls, they visited that city with a view to further investigation and, as they relate, ran into a blizzard, on account of which, owing to the stormy weather and deep snow, they decided to and did take the train on the same evening for Chicago, and while waiting for the next train out were directed, in answer to their inquiry for a good place to get a drink, to complainant's saloon, of which they availed themselves. They remained there some time, and fell into conversation with complainant, who waited upon them. In the conversation he learned that they were investigating the

Carpenter-Cook lands with a view to securing iron ore property. Their version of the conversation which followed is that complainant claimed to know where the Carpenter-Cook lands were, and talked familiarly of different mines and prospects in that locality, stating he was interested in some properties in the vicinity which he would like to have them examine; that before they left they informed him they expected to send a man to look over the Carpenter-Cook lands, and they would be glad also to investigate his properties, but that no promise, agreement, or contract of any kind was entered into for him to secure them any mining property, nor suggestion made that they would "whack" with or engage his services for that purpose. They did, however, send a coal-mining man in Clutts' employ named Morrow up there, primarily to investigate the Carpenter-Cook lands, as he and they testify, and any other ore property that he might think worth looking into. Clutts gave him a letter to Cook & Carpenter, of Menominee, and also one to complainant. He stopped at Menominee on his way up, where he spent some time going over the subject with Mr. Cook, after which he went on to Crystal Falls, where he was a stranger, and the next morning after his arrival met complainant Schook in his saloon, introducing himself and presenting the following letter:

"WELLSTON, OHIO, Dec. 13, 1906.
"MR. PAUL SCHOOK,
    "Crystal Falls, Mich.
"My Dear Sir:
    "This will introduce to you Mr. Jerry Morrow, who represents Col. Zimmerman and myself in looking after ore properties in your neighborhood. You will remember we spent an afternoon with you in talking over the matter and you had some friend at that time who had quite a good prospect. We will be pleased to have you show Mr. Morrow the same courtesies you did us.

"With kindest regards, I remain, yours truly,
                                   "J. C. CLUTTS."

Morrow discussed with Schook the purpose of his visit to that region, and hired from him rigs and a driver to visit certain of the Carpenter-Cook lands, as well as other property around Crystal Falls. He remained at Crystal Falls, looking around, for about three days, during which time he several times talked upon the subject of his mission with Schook, who proposed certain properties which he desired Morrow to investigate, and upon some of which Morrow later took options from the owners, without beneficial results. While at Menominee Morrow had been advised by Mr. Cook to investigate the mining prospects at Iron River in that county, and on December 26, 1906, or the third day after his arrival at Crystal Falls, they drove over there together, upon whose initiative is a matter of dispute. On the way over Schook told Morrow of a mining prospect known as the Kinney property described as E. $\frac{1}{2}$ of N. W. $\frac{1}{4}$, Sec. 7, town 42 north, range 34 west, near Iron River, upon which he thought an option could be obtained and which he recommended. Prior to this time neither Morrow, Clutts, nor Zimmerman knew or had ever heard of this property, and it was first made known to the two last-mentioned defendants by Morrow.

A Mr. McKinnon, with whom Schook was well acquainted, held a 30-year mining lease of this property, upon which he and others had done considerable exploratory work without yet discovering any valuable deposit of commercial ore, and, being himself unable to further prosecute explorations, he had given an option upon his rights to other parties who had also explored unsuccessfully, and no work was then being done by them, as their option was about to expire. This tract was recognized as well located, adjoining land upon which ore had been found, so that it con-

tinued to be regarded by those interested as a promising prospect. Schook had knowledge of these things, and also claimed to have special information of its possibilities from men who had worked upon adjoining property. While driving Morrow to Iron River he outlined these matters to him, and highly recommended the property as a desirable one, upon which he proposed to secure an option for a sublease from McKinnon to Zimmerman and Clutts in performance, as he claimed, of his agreement to obtain a mine for them. On their arrival at Iron River Schook took Morrow to his brother's saloon, where he left him to get warm, and hunted up McKinnon, with whom he had an interview, which he details in his testimony at great length, and as a result of which, according to his statements, McKinnon promised him, for Zimmerman and Clutts, an option for a sublease of the property when the present outstanding option should expire, which would be in three days. This McKinnon denied, testifying positively that Morrow was the only one with whom he made preliminary agreements, saying:

"Paul Schook never came to me to obtain an option for a mining lease on the Kinney property for any one."

It should, however, be stated in fairness to Schook's claim that a careful examination of McKinnon's testimony as a whole indicates a remarkable lack of memory touching undisputed facts which must have been known to him and which tend in Schook's favor. Whatever the facts of their interview may be, it is undisputed that Schook took McKinnon to Morrow and introduced him, exercising his good offices in bringing the parties together upon an agreement for an option of a sublease of the Kinney property to defendants Clutts and Zimmerman, and then returned to Crystal

Falls, leaving Morrow at Iron River to negotiate the details of the deal, with the apparent understanding amongst those interested that when the former option expired McKinnon would give a new one to those whom Morrow represented. On January 2, 1907, McKinnon gave Morrow the following:

"BOYINGTON HOUSE.    LIVERY IN CONNECTION.
          "BOYINGTON & SON, PROPRIETORS.
                    "IRON RIVER, MICH., Jan. 2, 1907.
"JERRY MORROW, ESQ.,
      "Iron River, Mich.
"*Dear Sir:*
      "In our conversation about the Kinney option & lease form, I will hold the privilege open till the 15th inst. for you to decide to take an option or not after the form read by you on Saturday 29. December, 1906.
                              "D. C. MACKINNON."

On the same day Morrow telegraphed Clutts from Iron River, "Arrange to come here on receipt of letter mailed tonight, very important," writing him a lengthy letter descriptive of the district and Kinney property, of which he stated he had succeeded in getting hold, making no mention of Schook. Schook, who was at Crystal Falls, had obtained Clutts' address from Morrow and kept posted by telephone communications with him as to how negotiations were progressing. On January 5, 1907, he sent the following telegram:

                    "CRYSTAL FALLS, MICH., Jany 5th, 1907.
"J. C. CLUTTS,
      "Wellston, Ohio.
      "Matters have so shaped themselves that your immediate presence here is imperative. Danger of losing deal be here at all hazards not later than Tuesday night deal is too big to take any chances
      "Answer                    PAUL SCHOOK."

This was answered as follows:

                    "WELLSTON, OHIO, 7.
"PAUL SCHOOK,
      "Crystal Falls, Mich.
      "Impossible for me to come to your place right away.

See that Morrow gets option so I can arrange with him to close after seeing him. Have him bring style of lease along with him. Wire me Boody House, Toledo.                          J. C. CLUTTS."

From the lengthy testimony as to subsequent events it is sufficient to state that Zimmerman and Clutts obtained an option upon the Kinney property and expended about $17,000 in explorations, making discoveries which were followed by their demanding and receiving the sublease for which the option provided and which, at their dictation, was issued to the defendant Spring Valley Iron Company, a corporation with a large capitalization, which they organized to take over and operate the property. They were practically the owners and in control of this corporation and its assets, sufficient stock being issued to their attorney and certain employees to formally organize a corporation, from which they subsequently received back the money which they had advanced in exploration and development.

While these matters were progressing Clutts and Zimmerman made visits to Iron county, continuing all the time in friendly communication and relations with Schook, availed themselves of the co-operation and assistance which, by reason of his acquaintance with various persons and knowledge of local conditions, he was able to afford. He claims to have rendered these services in fulfillment of the original oral contract made when they first met in his saloon, upon which this suit is based under the allegations in his bill. Of his former claims he was asked and answered as follows:

"*Q.* When you claimed to own an interest in the mine, you meant what?

"*A.* An interest in the fee.

"*Q.* When you claimed to own an interest in the

Kinney mine, you have claimed to own an interest in what?

"*A*. In that lease."

He states that it was his then understanding "that the three of us was in that deal," and says he made no mention of "profits" "until we took that lease." Asked:

"Did you ever ask him [Morrow] what he had agreed with Mr. McKinnon in relation to the terms of the option and the extension and the other details?"

—he replied:

"No, sir; I had the property and I was to see they got it and they got it."

After it was ascertained that a valuable iron mine was discovered and in operation on the Kinney property, complainant, failing to obtain from defendants satisfactory recognition of his claim, filed this bill of complaint, October 20, 1911, claiming a right to share in the profits realized from the operation of said mine, based on the alleged oral contract made in his saloon some time between November 15 and 20, 1906. As a basis for ascertaining what share of the profits complainant was entitled to, he introduced testimony touching the amount of royalty others had received in that region for like services in successful mining promotions, under the claim that it was the general custom to pay 10 cents per ton in similar cases and his contract should be treated as made with reference to such custom.

The controlling issues of fact raised by the allegations of the bill and defendants' denying answer were, whether there was an express oral contract made as alleged and performed on complainant's part, the defendant corporation's liability under it if such contract was made, and the existence of a custom to pay 10 cents per ton royalty in similar cases, which could and should be construed as forming part of such contract.

A written opinion was filed by the trial court reviewing the case in its various aspects, in which the court found that the initial contract as alleged in complainant's bill, or the agreement to "whack" if he could get them a mine, "was not shown by a preponderance of the evidence," that "complainant failed to establish the existence of the custom" claimed, and that no liability on the part of the defendant corporation was shown, but concluded that what passed between the parties on the occasion of their first meeting—

"was equivalent to a proposal by Zimmerman and Clutts that if Mr. Schook brought them a property which proved to be a mine, they would reasonably compensate him for his services."

The court thereupon proceeded to determine and decree what it deemed reasonable compensation for the services it was found Schook had rendered, on the assumption, as is inferable, that, having obtained jurisdiction under the equitable allegations in complainant's bill, the court should retain jurisdiction to dispose of the whole controversy, and rendered a decree requiring Zimmerman and Clutts to pay complainant 4 cents per ton on all ore mined from the Kinney property during the life of the lease which they had obtained, on which basis the sum of $21,018.24 was found due and payable forthwith; declared a lien upon all their stock in the defendant iron company for any sums due or to become due from them to said complainant by reason thereof; required them to forthwith present their certificates of stock to said company to be indorsed, and that said company indorse upon them a notation of such lien and spread upon its records a copy of such decree. From this decree both parties have appealed. Complainant contends that the decree should be modified to conform with the allegations in his bill and supporting proofs under which the alleged contract should be sustained; that relief should be

granted directly against the defendant company, as well as against Zimmerman and Clutts, one-third of whose stock in said company should be awarded outright to complainant, or that they should be decreed to pay him 10 cents per ton for all ore mined. Defendants contend, on the other hand, that the equitable grounds for relief stated in complainant's bill were not sustained by the evidence, and the court, having necessarily so found, was without jurisdiction to award damages on a bare implied contract to compensate for services performed which differed from that alleged in the bill and involved only a promise to pay, thus making a case within the exclusive jurisdiction of a court of law.

The latter contention raises a serious question under the pleadings and proofs, whatever view may be taken of the intrinsic merits of complainant's claim. While equity will retain jurisdiction to settle controversies for which courts of law afford adequate relief when they are involved with and grow out of an equitable cause which gives the chancery court jurisdiction, the bare pleading, in connection with them, of equitable rights not proven does not confer jurisdiction to try such controversies, which otherwise are of exclusive law jurisdiction. The legal remedy administered in an equity court must be connected with and grow out of an equitable right both alleged and proven.

"There is no authority for holding that equity can grant damages unless there is some case of equitable relief made out also, to which the damages would be applicable or subsidiary." *Bourget* v. *Monroe*, 58 Mich. 563 (25 N. W. 514).

The only ground for equitable relief stated in complainant's bill is a trust, or fiduciary, relation between the parties, based upon the claim of a right under the alleged agreement to share in the profits accruing to defendants from the Kinney mine, entitling him to an

accounting, the profits constituting a trust fund. The trial court did not, and, as an examination of this record convinces us, could not find that the contract alleged in complainant's bill was sustained or established by the evidence. The court did find that what passed between the parties in the saloon at the time they first met, when it is alleged the contract stated in the bill was entered into, was equivalent to a proposal that if complainant—

"brought them a property which proved to be a mine, they would reasonably compensate him for his services."

An express or implied agreement to pay, or compensate a person for services rendered, involves no suggestion of a division of profits. The court rightly found no custom proven as claimed; and, if one were shown, it could not be an element of the contract, unless it was also proved that Zimmerman and Clutts knew of and therefore presumably contracted with reference to it. There was no evidence of this, but, on the contrary, they were then strangers in that locality, and testify positively that they did not. Although it is alleged in complainant's bill that by the express contract relied upon they were to give him "a just, fair, and proper share of such profits," the record is entirely destitute of any evidence to sustain such allegations or mention of profits in that connection, beyond complainant's statement they said they would "whack" with him, which the court finds was not established by a preponderance of evidence. But if this was said, it furnishes no sufficient support for a chancery decree of specific performance of a contract to pay for service in profits.

"An action at law for breach of contract can often be maintained, although some of the terms of the contract are not established with exactness. It is otherwise where specific performance is required. The

court, in order that it may frame a decree in accordance with the intent of the parties, must be clearly apprised of the intent in all essential respects. A greater degree of certainty is required than in actions at law for damages." 36 Cyc. p. 589.

When in colloquial use the word "whack" has import of the nature suggested here, it is recognized by the lexicographers as slang, meaning "to divide into shares; apportion; parcel out; make a division settlement; square accounts; pay;" often in the phrase "to whack up." *Vide* Century Dictionary. Whether in this case, if used, it was intended to mean they would whack with complainant an interest in the property or lease, which, being oral, would be void under the statute of frauds, or pay him for his services, or settle with him, and on what basis, or give him a share in the profits as he claims, or a royalty on ore mined regardless of profits, and what share, are matters of conjecture upon which the alleged contract is uncertain and incomplete. In Waterman on Specific Performance of Contracts, p. 199, it is said:

"If there be strong doubt whether both parties to a contract understand it alike, the court will not decree specific performance."

In the footnote to this proposition it is said:

"Clearness and certainty in a contract are obviously so important and fundamental it seems scarcely necessary to say very much on the subject, or refer to many authorities. The following cases will give the student some idea of the manner in which precision in agreements is required by the courts" (citing a large number of authorities).

In the case of *Petrie* v. *Torrent*, 88 Mich. 43 (49 N. W. 1076), cited by complainant, and along the lines of which his bill appears to have been framed, the chancery court took jurisdiction and granted specific performance of the contract alleged and proven, be-

cause there was shown an express agreement to divide profits upon a given ratio, and therefore trust relations existed between the parties, defendant having in his hands, and being trustee as to, agreed profits which were alleged and proven, entitling complainant to an accounting. In that case the contract alleged and sustained by the evidence was certain and complete. It appears that the complainant had an option upon, control of, and the right to purchase certain described timber lands which by their agreement he surrendered to defendant under a contract by which the amount of money each was to pay and the work each was to perform, with full details of the enterprise, were defined and stated at length, differing radically in that particular from the instant case. This marked distinction we think runs through all the cases cited by complainant, and all those we have been able to consult, where specific performance was decreed, whether the contract relied upon was oral or in writing.

The conclusions of the court, with which we do not disagree, that, "whatever may have been said or omitted in the conversation referred to," it was, in the light of subsequent events, equivalent to a proposal of Zimmerman and Clutts that if Schook brought them a property which would prove to be a mine, they would reasonably compensate him for his services; that, acting upon it, he brought the property to their notice, introduced McKinnon to their representatives, exerted his influence with McKinnon to deal with them, and was instrumental in their obtaining this property, for which reason he is entitled to reasonable compensation —go no farther than to make a case triable by jury, if either party so elects, on the law side of the court for breach of contract; but, aside from this, and conceding these conclusions, we are unable to find from the record that the allegations in complainant's bill

which would, if true, confer upon an equity court authority to take jurisdiction, decree performance, and dispose of the matter are established by any competent evidence.   ·

As a reason for and leading up to the decree that complainant, by reason of services rendered, was entitled to 4 cents per ton royalty for all ore produced by the mine under the sublease held by defendants, the court expressed the view that:

"It is not open to serious dispute but that before the Kinney option was issued to them, Zimmerman and Clutts actually knew of Mr. Schook's claims, and that with expectation his claims would be realized, he had and was continuing to employ himself in an effort to obtain the option for them, and that, with such knowledge, they accepted the results of and profited by his efforts without repudiation of his claims, until after the lease, as well as the option, was secured to them."

Conceding, as this imports, that, having proposed to compensate him for his services if he brought them a property which proved to be a mine, by afterwards accepting and profiting through his efforts without repudiating his claims, as known to them, until after they secured the lease, they were bound by such claims and estopped from denying them, the absence of equity jurisdiction yet remains; for there is no proof of claim for royalty at any time, and complainant himself testifies he made no claim for, or mention of, profits until the lease was taken.   His claims before the lease was secured, if known to them, that they had agreed to whack, or compensate, him for services, as the court found, or that he owned an interest in the mine or lease, which he subsequently abandoned, which might some of them furnish ground for an action at law in assumpsit for breach of contract, could give no equity jurisdiction to render a decree for specific performance.

In this view of the case the other interesting questions presented by the rather extended record and discussed in the briefs of counsel do not demand consideration here. We are constrained to hold that complainant's bill must be dismissed for the reason that his proofs, failing to correspond with the allegations of his bill, do not show a contract sufficiently certain in essential particulars to permit enforcement of specific performance by a court of equity, and no alleged grounds which give the chancery court jurisdiction are sustained by the proofs.

The decree is therefore reversed without prejudice, with costs to defendants.

BROOKE, C. J., and KUHN, STONE, OSTRANDER, BIRD, and MOORE, JJ., concurred.

The late Justice MCALVAY took no part in this decision.